UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| IN RE APPLICATION OF REPUBLIC OF KAZAKHSTAN FOR AN ORDER DIRECTING DISCOVERY FROM STANDARD AMERICAS, INC. PURSUANT TO 28 U.S.C. § 1782. | Misc. Action No. _____ |

## DECLARATION OF MATTHEW H. KIRTLAND

Pursuant to 28 U.S.C. § 1746, I, Matthew H. Kirtland, declare as follows:

1. I am an attorney at law, and am admitted to practice law in the District of Columbia and Maryland. I represent the Republic of Kazakhstan ("Kazakhstan" or "Petitioner").

2. I am over the age of eighteen (18) and make this declaration from personal knowledge based on information reviewed or referenced herein.

3. I submit this declaration in support of Kazakhstan's Application for Discovery in Aid of a Foreign Proceeding Pursuant to 28 U.S.C. § 1782 (the "Application"), filed herewith.

4. The Application requests discovery from Standard Americas, Inc. ("Standard Americas"). Standard Americas maintains an office at 520 Madison Avenue, New York, New York, 10022. Standard Americas has a registered agent for service of process in New York, New York: CT Corporation System, 111 Eighth Avenue, New York, New York, 10011.

5. The discovery is requested in connection with ongoing legal proceedings pending in the courts of England, the Netherlands, Belgium, and Luxembourg.

## I. THE UNDERLYING SCC ARBITRATION AND PENDING FOREIGN PROCEEDINGS

### A. THE SCC ARBITRATION

6. In the SCC Arbitration, Anatolie Stati, Gabriel Stati, Ascom Group, S.A. and Terra Raf Trans Traiding Ltd. (the "Stati Parties") demanded compensation for alleged expropriation by Petitioner of certain assets in Kazakhstan. One of the assets for which the Stati Parties sought compensation was a liquefied petroleum gas plant (the "LPG Plant").

7. On December 19, 2013, an award was issued in the SCC Arbitration in favor of the Stati Parties against Petitioner ("SCC Award"). As part of the award, the Tribunal relied on various allegations by the Stati Parties to award them $199 million in compensation for alleged expropriation of the LPG Plant.

8. The Stati Parties initiated proceedings to enforce the SCC Award in multiple jurisdictions, including in the courts of England, the Netherlands, Belgium, and Luxembourg. The $199 million valuation of the LPG Plant is, among other things, directly at issue in each of these proceedings.

9. Kazakhstan contends that the Stati Parties procured the SCC Award by fraud, and that the SCC Award is therefore unenforceable in England, the Netherlands, Belgium and Luxembourg.[1] Specifically, Kazakhstan contends that (a) the Stati Parties used a number of schemes to fraudulently inflate the construction costs of the LPG Plant, including through multiple related-party transactions with a sham company called Perkwood Investment Limited

---

[1] The Stati Parties also have sought to enforce the SCC Award in the United States in an action before the United States District Court for the District of Columbia, which is captioned *Anatolie Stati et al. v. Republic of Kazakhstan*, No. 1:14-cv-1638-ABJ (D.D.C.). In that action, Kazakhstan has a pending request for leave to amend its defenses to enforcement of the SCC Award to include the contention that the Stati Parties procured the SCC Award by fraud. *See* Mot. for Leave to File Additional Grounds in Support of Opposition to Petition to Confirm Arbitral Award (ECF 32); Mot. for Reconsideration (ECF 37). Also, on October 5, 2017, Kazakhstan filed a complaint against the Stati Parties alleging that their fraudulent conduct violated, *inter alia*, the Racketeer Influenced and Corrupt Organizations Act ("RICO"), which is captioned *Republic of Kazakhstan v. Anatolie Stati et al.*, No. 1:17-cv-02067-ABJ (D.D.C.). Kazakhstan is in the process of serving this complaint.

("Perkwood"); (b) throughout the SCC Arbitration, the Stati Parties relied on false evidence to claim that they had invested over USD 245 million in the LPG Plant, when in fact such sums were not invested in the LPG Plant; (c) the Stati Parties communicated the fraudulently inflated LPG constructions costs to their auditor, and thereby obtained falsified financial statements, which they also relied upon in the SCC Arbitration; (d) before the SCC Arbitration commenced, the Stati Parties used the falsified financial statements to procure an indicative bid from the Kazakh state-owned company KazMunaiGas ("KMG") to purchase the LPG Plant in the amount of USD 199 million; and (e) the Stati Parties used this fraudulently obtained KMG indicative bid in the SCC Arbitration to obtain the award of $199 million in compensation for the LPG Plant.

### B. THE PROCEEDINGS IN ENGLAND

10. In England, on February 24, 2014, the Stati Parties initiated proceedings to enforce the fraudulently procured SCC Award in the High Court of Justice, Queen's Bench Division, Commercial Court (the "London Court") in London, captioned *Anatolie Stati et al. v. Republic of Kazakhstan*, CL-2014-000070. These proceedings were brought under the New York Convention, as incorporated in the English Arbitration Act 1996.

11. On June 6, 2017, on the basis of evidence and legal submissions, the London Court issued a judgment that concluded that "there is a sufficient prima facie case that the [SCC] Award was obtained by fraud," and that the interests of justice require that Kazakhstan's fraud allegations be "examined at trial and decided on their merits." The trial of Kazakhstan's fraud allegations is scheduled to occur in November 2018.

### C. THE PROCEEDINGS IN THE NETHERLANDS

12. On August 23, 2017, the Stati Parties filed an *ex parte* application with the District Court in Amsterdam, the Netherlands (the "Dutch Court"), seeking leave to levy a

3

number of pre-judgment attachments against assets purportedly belonging to Kazakhstan. The Stati Parties filed an amended application on August 31, 2017.

13. In a September 8, 2017 decision, the Dutch Court authorized some but not all of the *ex parte* prejudgment attachments. The Dutch Court authorized the levying of the attachments under the condition that the Stati Parties institute proceedings on the merits—*i.e.*, a request for an exequatur. On September 14, 2017 the Stati Parties levied the allowed attachment and garnishments. The attachment that has been levied on JSC Samruk-Kazyna's shares in its Dutch subsidiary is still in place. An application to have this attachment lifted has been denied by the Dutch Court. The matter is currently pending before the Amsterdam Court of Appeal. The garnishment that has been levied with Procon Europe B.V. has been lifted pursuant to an order by the Dutch Ministry of Justice.

14. On September 26, 2017, the Stati Parties filed a request for an exequatur with the Amsterdam Court of Appeal.

15. By order dated January 23, 2018, the Dutch Court lifted the *ex parte* attachments levied by the Stati Parties on Bank of New York Mellon SA/NV, insofar as those attachments cover (i) assets which are part of the National Fund, (ii) bank and securities accounts in the name of the National Bank of Kazakhstan, (iii) claims based on the Global Custody Agreement and monies and securities held pursuant to the Global Custody Agreement and (iv) other assets of the National Bank of Kazakhstan. The Dutch Court found, among other things, that the Stati Parties had breached an "obligation to be truthful" to the Court.

16. A hearing on the exequatur proceedings is scheduled for June 22, 2018.

17. In the Dutch exequatur proceedings, Kazakhstan is contending that the SCC Award is unenforceable and therefore should be not granted exequatur because the Stati Parties procured the SCC Award by fraud.

### D. THE PROCEEDINGS IN BELGIUM

18. On September 29, 2017, the Stati Parties filed an application for permission to make a prejudgment attachment (in the form of a preliminary garnishment) against Kazakhstan in the Brussels First Instance Court (the "Brussels Court"). The Brussels Court issued a preliminary garnishment order on October 11, 2017. Kazakhstan filed an application to set aside the preliminary garnishment order on November 20, 2017. An introductory hearing was held on December 1, 2017. The substantive hearing is currently scheduled to be held on April 27, 2018.

19. On November 13, 2017, the Stati Parties filed an *ex parte* exequatur application with the Brussels Court. On December 11, 2017, the exequatur was granted on an *ex parte* basis. The exequatur decision was served on Kazakhstan on January 2, 2018. Kazakhstan served a summons to set aside the exequatur on February 2, 2018. An introductory hearing is scheduled to be held on March 13, 2018. In these proceedings, Kazakhstan is contending that the SCC Award is unenforceable and therefore should be not granted exequatur the Stati Parties procured the SCC Award by fraud.

### E. THE PROCEEDINGS IN LUXEMBOURG

20. On August 16, 2017, the Stati Parties *ex parte* served a garnishment order based on the SCC Award to presumed debtors of Kazakhstan located in the Grand Duchy of Luxembourg in order to seize certain specified monies. The Stati Parties subsequently served a summons to Kazakhstan to appear before a competent Luxembourg judge in order for the garnishment to be validated and so to obtain payments from the presumed debtors.

21. On August 24, 2017, the Stati Parties filed an *ex parte* request for exequatur of the SCC Award with the President of the Luxembourg District Tribunal. On August 30, 2017, exequatur of the SCC Award was issued.

22. Subsequently, the Stati Parties served the exequatur on Kazakhstan. On November 2, 2017, Kazakhstan filed an appeal of the exequatur. The appeal is currently pending. On December 1, 2017, the Stati Parties ex parte served a second garnishment order based on the SCC Award to additional presumed debtors of Kazakhstan located in the Grand Duchy of Luxembourg in order to seize certain specified monies. The Stati Parties subsequently served a summons to Kazakhstan to appear before a competent Luxembourg judge in order for this garnishment to be validated and so to obtain payments from the presumed debtors.

23. In the *Luxembourg* exequatur proceedings, Kazakhstan is contending that the SCC Award is unenforceable and therefore should not be granted exequatur because the Stati Parties procured the SCC Award by fraud.

## II. THE NOTEHOLDERS

### A. THE INDENTURE

24. To fund their investments in Kazakhstan, including the LPG Plant, the Stati Parties raised money from investors. Specifically, the Stati Parties, acting through companies that they controlled—Tristan Oil Ltd. ("Tristan"), Kazpolmunay LLP ("KPM"), and Tolkynneftegaz LLP ("TNG")—entered into an Indenture with Wells Fargo Bank, National Association ("Wells Fargo"). A true and correct copy of the Indenture is attached hereto as Exhibit 1.

25. Wells Fargo served as the trustee under the Indenture. Pursuant to the Indenture and its amendments, Notes were sold to multiple investors (the "Noteholders"). The Indenture

contained covenants regarding financial transactions and reporting to protect the rights of the Noteholders.

26. First, Section 4.12 of the Indenture stated that Tristan, KPM and TNG could not "make any payment to, or sell, lease, transfer or otherwise dispose of any of its properties or assets to, or purchase any property or assets from, or enter into or make or amend any transaction, contract agreement, understanding, loan, advance or guarantee with, or for the benefit of, any Affiliate," unless:

- If the aggregate consideration was in excess of $1.0 million, the transaction was required to be on an arm's length basis (*i.e.*, the transaction was on "terms that are no less favorable to [Tristan] or to [KPM or TNG] than those that would have been obtained in a comparable transaction by [Tristan] or [KPM or TNG] with an unrelated Person");

- If the aggregate consideration was in excess of $3.0 million, Tristan was required to deliver to the Trustee (*i.e.*, Wells Fargo) a resolution of Tristan's board of directors set forth in an Officers' Certificate certifying that by a majority of the disinterested members of the board of directors and at least one independent director of the board of directors have determined that the transaction complied with Section 4.12;

- If the aggregate consideration was in excess of $10.0 million, Tristan was required to deliver to the Trustee (*i.e.*, Wells Fargo) "an opinion as to the fairness to [Tristan] or [KPM or TNG] of such Affiliate Transaction from a financial point of view issued by an accounting, appraisal or investment banking firm of national standing[.]"

7

Ex. 1 (§ 4.12).

27. Second, Section 4.03 the Indenture required that KPM and TNG to produce combined financial statements with Tristan on a quarterly and annual basis, as well as a reserve report from an independent petroleum engineer on an annual basis. *Id.* (§ 4.03).

28. Third, Section 4.04(a) of the Indenture required Tristan, KPM and TNG to deliver to the Trustee, *i.e.*, Wells Fargo, within ninety (90) days after the end of each fiscal year, an Officers' Certificate stating that a review of the activities of Tristan had been made "with a view to determining whether [Tristan] has kept, observed, performed and fulfilled its obligations" under the Indenture, and stating that, for each Officer signing the certification, "to the best of his or her knowledge [Tristan] has kept, observed, performed and fulfilled each and every covenant" of the Indenture and "is not in default in the performance or observation of any of the terms, provisions and conditions" of the Indenture. *Id.* (§ 4.04(a)).

29. Fourth, Section 4.04(b) of the Indenture further required that the year-end financial statements delivered pursuant to Section 4.03 be accompanied by a written statement of Tristan's independent public accountants that "in making the examination necessary for certification of such financial statements, nothing has come to their attention that would lead them to believe that [Tristan] has violated any of the provisions of Article 4 or Article 5 hereof, or if any such violation has occurred specifying the nature and period of existence thereof," including, *inter alia*, Section 4.12's restrictions on transactions with Affiliates. *Id.* (§ 4.04(b)).

### B.  THE SHARING AGREEMENT

30. On December 17, 2012, the Stati Parties as well as Tristan, on the one side, and certain of the Noteholders, on the other side, entered into a so-called "Sharing Agreement and

Assignment of Rights" (the "Sharing Agreement"). A true and correct copy of the Sharing Agreement is attached hereto as Exhibit 2.

31. Under the Sharing Agreement, any amounts collected by the Stati Parties on the SCC Award are to be paid on an account administered by a security agent. The Sharing Agreement provides for a mechanism of the distribution of the Proceeds paid into the account among the Stati Parties and the Noteholders.

### III. THE *INTEL* FACTORS

32. The Republic of Kazakhstan was a party to the SCC Arbitration and is a party to the above-described proceedings currently pending in the courts of England, the Netherlands, Belgium, and Luxembourg.

33. The documents sought by the Republic of Kazakhstan are for use in the above-described proceedings pending in the courts of England, the Netherlands, Belgium, and Luxembourg.

34. Standard Americas is not a participant in the above-described proceedings pending in the courts of England, the Netherlands, Belgium, or Luxembourg.

35. There is no indication, or reason to believe, that the courts of England, the Netherlands, Belgium, or Luxembourg would be unreceptive to judicial assistance by § 1782 discovery.

36. The Republic of Kazakhstan's request for discovery is not sought to, and does not have the effect of, circumventing any foreign proof-gathering restrictions or other policies.

37. The Republic of Kazakhstan's request is not unduly burdensome or intrusive. It seeks a discrete category of documents in the possession, custody and control of Standard Americas.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on February 12, 2018.

_____
Matthew H. Kirtland